May it please the court, Rob Snyder for the appellant, Winston Hencely. The judgment in favor of Fluor should be reversed for two reasons. First, the district court erred when it granted summary judgment to Fluor on its affirmative defense of preemption, despite the presence of disputed issues of material fact. Second, the district court erred when it dismissed Specialist Hencely's breach of contract claim with prejudice. Those are the two issues raised in our briefs. In its response, Fluor also raised the issue of subject matter jurisdiction. So unless the panel would like for me to take the issues in a different order, I'm going to quickly address the court's jurisdictional order and then move on to preemption. The district court entered a detailed order in June 2020, finding that it had subject matter jurisdiction over Specialist Hencely's claims. In doing so, it considered evidence outside of the pleadings, including the Army report, which the district court summarized in a detailed portion of the order, alphabetically from A to close to Z. The district court found in its jurisdictional order that there was no evidence of any formal directives from the Army to Fluor about how it was to supervise its employees in the non-tactical vehicle yard. And it found that Fluor operated with wide latitude and considerable discretion. Because of those factual findings, the district court concluded that the first Taylor factor, plenary control, was not met. The second Taylor factor was not met because under South Carolina's apportionment law, there is no apportionment to non-parties. And the Army is an immune non-party in this situation. So in addition to not being able to apportion fault to the Army, under South Carolina law, the jury could never find the Army to be the proximate cause of the specialist's injuries. So the second Taylor factor, whether the court would have to evaluate military decisions, was not met. That order was entered in June 2020. The district court necessarily reaffirmed its jurisdiction over Specialist Hensley's claims in August 2021 when it entered a judgment in favor of Fluor. So there's some overlap, it seems like to me, between this second part of the Taylor test and parts of the Tort Claims Act preemption argument in terms of the courts impinging upon federal interests in terms of military judgments. Part of what we're admonished to do in these cases is we'll look at it as how the case would be tried. So if the defendants in this case, as you present yours, then present a case that says, well, there's contributory negligence here on the part of the Army because of the defective way that they handled the recruitment of this individual and they didn't disclose that he was part of the Taliban, that sort of thing. Does that have any effect on how we decide either the second part of the political question under Taylor or the Tort Claims Act? What this court found in the Burn Pit case and what the Third Circuit found in Harris is that if the defendant wants to raise a causation defense, which is what Fluor would do here, that does not implicate the Army is shown to be the cause of the injuries and there's a proportional liability system. So here we're under South Carolina law. The parties agreed when they briefed the jurisdictional issues that South Carolina law governed. And under South Carolina law, you cannot apportion fault to a non-party. So the second Taylor factor is not implicated if there's going to be no apportionment possible to the Army, even if the factual question of what the Army did may be an issue in the case. So for purposes of preemption, all of the evidence that was in the record when the district court ruled that it had jurisdiction over these claims was still in the record a year later. That evidence alone was enough to create a disputed issue of material fact on whether the Army had command authority over Fluor for purposes of the preemption question. We don't dispute that this is a combatant activity under the four circuits holding and burn pit. The only question that is at issue is whether the Army had command authority. Let's get a factual question, which is what evidence, if any, do you have that Fluor was aware of the bomber's ties to the Taliban? The evidence that we have of that is Fluor's general knowledge that former Taliban fighters were a part of this reintegration program. And there is some evidence, it's from another case that Fluor tried or was against a different party out in Colorado that there was seepage between the screening cell that was manned by a Fluor subcontractor in between Fluor management. But the question of whether they knew about his Taliban, and that's what we have. It's disputed whether they knew or should have known of his Taliban ties. Fluor said they did not. We submit there's at least an evidentiary question on that point. But for purposes of preemption, the question is whether the specialist's claims actually implicate the Army's command authority. And the specialist's claims are for negligent supervision and negligent retention. And the record on those claims is exactly what the district court found in June 2020, that Fluor had wide latitude and considerable discretion to determine how it was to supervise its own employees and subcontractors in the non-tactical vehicle yard. The evidence of that is in the Army report, which was based on a detailed and lengthy investigation that followed the bombing. In the contract itself, the performance work statement specifically says that Fluor is required to provide the necessary supervision. But there is no further evidence in the record. Can I ask you about that though, the work statement? Because you pointed out in your briefs and Harris and Salih both talk about the performance work statement. What I'm wondering here is the performance work statement gives Fluor many responsibilities they're being hired to do and says we want you to accomplish these goals and they have them. But this case seems a little different in that we're talking about supervising someone who's a security risk and how that's done. And did the contract give Fluor the requisite discretion in doing that? Or are there these additional requirements like the escrow requirement, the badge requirements? These are, it seems like we have to consider those in addition to the performance work based, the performance based contract. Because we're talking about not, you know, did they supervise him as he, you know, in terms of like, was he making enough widgets? But did they follow the military's escort policy that's put in place to protect people from enemy combatants? Your Honor, we have not alleged that purposes. We have alleged that what they failed to do was to supervise him for his work-related purposes, and that that failure is what caused the bombing. That's precisely what the Army found in the Army report. The escort policy, which one of the- I thought you had alleged that part of their negligence, which would seem to go to the security aspect, was that when he was supposed to get on the bus to go to the gate, that he didn't get on the bus and they did not follow procedure at that point. Isn't that a security risk aspect? It's a security risk in that we know what Mr. Nyeb did, right? We know he committed an intentional act that caused an injury. That- Fluor was given the discretion by the Army to figure out how to get their workers onto the bus. The escort policy, it does not apply to the work area. There is no requirement that Fluor escort its employees or subcontractors in the work area. And they say that they asked the Army, they told the Army, hey, we, you know, for a fee, we'll supervise them, we'll escort them in the work area. And the Army said, no, we can't pay for that. We don't want to do that. That's the evidence that is in the record, Your Honor. But for purposes of this question, Fluor, it's undisputed that Fluor had both supervision and escort responsibilities. But I guess my point is, why isn't that relevant? If, you know, for political question, yes, you have to show, you know, whatever the actual and, you know, almost total control. But when we're talking about preemption, the cases we have seem to, you know, Saleh, for instance, acknowledges that you don't have to have that level of control, that you can have both the measure of discretion. But if the military retains ultimate command authority, then we're in the preemption land. That's at least the second factor, right, has been satisfied. So why isn't it relevant that the military is who's making choices about where these people have to be escorted, and to what extent they have to be observed and escorted because they are security risks, not because of, you know, it's important to how they create their widgets. The inquiry is whether the conduct that's at issue is under the command authority of the military. And what the evidence shows here, at least we contend there's a disputed issue on this, is that the Army did set parameters for escort, but it limited the application of those parameters when the local nationals were in their work area. And in that area, in the Fluor non-tactical vehicle yard, how to supervise their employees, making decisions about whether they should fire somebody for workplace violations, those questions were left to the discretion of Fluor. So it could be that a claim based on a violation of the escort policy could potentially be preempted. But a supervision claim based on Fluor's failure to watch Mr. Nayib while he was working, there's no evidence in the record that the Army ever gave Fluor any specific commands. Isn't that your claim? I mean, the claim you're going to have to prove is that it was negligent because they knew something. Fluor knew he was a risk in some way. They knew something and they didn't act accordingly. It was proximately caused here. And that's connected to the security risk. That's connected to not getting on the bus, to not observing him while he's working because it you're saying Fluor's obligation is, I'm not saying they had to supervise their employees. You're right about that. I'm not saying they didn't have to, but there's a disconnect between the negligence theory that you say you're pursuing and what actually caused the harm here. Well, that's a question for the jury, Your Honor. If the jury accepts Fluor's argument that their supervision of him for work-related purposes was sufficient, then we might lose at trial. But what we have alleged is that Fluor was obligated to supervise Mr. Nayeb for his work and that their failure to do so was the cause of the bombing. That's what the Army concluded in its report. The Army did not suggest that Fluor had any security obligations. What they found was that Fluor had a complete vacuum in supervision in this area, that Fluor's supervision responsibility was clearly stated. Can I ask you about something about the Army report? And I don't know if this is relevant or what to do with it. I totally understand that your reading of the Army report is that the Army report says over and over again, this is Fluor's fault. And I mean no disrespect to the Army at all, but it does seem rather obvious to me that it would be in the Army's incentive to say over and over again that it's Fluor's fault and it's definitely not the Army's fault. Even though you can't sue the Army, even though the Army is completely immune from suit, the Army, for its own reasons, has perhaps an incentive to say it's totally not the Army's fault and it's assessing the political question part of this and I guess the preemption. Well, I'm certain that that will be Fluor's argument to the jury. It doesn't seem that implausible. I mean, you have to admit, it doesn't sound facially implausible that it, you know, in a world in which it's, I mean, something genuinely horrible happened. Obviously, a lot of things went wrong. And the two, I mean, other than the bomber, obviously, other than the bomber, the two principally plausible responsible parties for this horrible thing happening are the Army did a bad job or the contractor did a bad job. And the fact that one of those two parties is going to say that the other one is the one who totally did a bad job, I mean, strikes me as fairly consistent with what we know about human nature. I guess I'll say it that way. And I don't disagree with that, Your Honor. And that is an argument to the jury as to whether Fluor is responsible for this bombing. To get there, we have to get through this preemption question. And what the District Court did that was an error, was ignore the findings of the Army report. You can't, on summary judgment, this is an affirmative defense for which Fluor bears the burden of proof. The judge cannot disregard evidence in the record. So even if she does not find the Army report to be persuasive for the reason that you articulated, Your Honor, she can't discount it. She also cannot disregard the contractual obligations, which delegated supervision responsibility to Fluor. She can't admit that everyone who was supposed to be supervising this man was a Fluor employee or subcontractor. Fluor gave an on-the-record testimony. They were questioned by the investigators. And he asked Fluor straight out, who supervised this man on the night of the bombing? And there was no answer. The transcript says the man in charge of the NTVR raised his hands as if to say, we don't know. The only question right now on preemption is whether there is a factual dispute on command authority. The Army's report itself creates that factual dispute. Fluor says this is a security issue. Fluor says that this is a negligent hiring issue. Specialist Hensley has never alleged that Fluor was obligated to provide security. Specialist Hensley has never alleged that this case is about giving Mr. Nayeb access to the base. Instead, he has alleged that Fluor was obligated through its contract to supervise this man for work purposes, and that it failed to do so, and that that failure was a cause of this bombing. For purposes of preemption, that should be enough to create an issue of fact that can get this case to the jury. And the district court erred when it concluded that there was no dispute. In order to do that, district court necessarily had to accept Fluor's framing of Specialist Hensley's claims, which we submit is improper. The claim is for negligent supervision and negligent retention. It is not for negligent hiring. It is not for negligent access to the base. Those are all arguments that Fluor can make in its causation defense. You should blame the military for this. And one question about the Second Circuit's decision in Badia. If the Supreme Court grants in that case, do you think we should hold off deciding this case? Because you're all arguing this case under our existing framework and the possibility that the Supreme Court might blow up our whole framework. Would that be a reason for us to put off deciding this? I think that we should win this question under the Fourth Circuit's test. So I do not believe that there's any reason to hold a ruling on this. I know that the response brief is due in that case at the end of this by the end of the summer. So it may be that just with the court's other work that it might not get to it in time. But we believe and urge this court to conclude that we should win this question under the existing Fourth Circuit framework. Thank you. I'll reserve the remainder of my time. Thank you. Mr. Russell. Thank you, Your Honors. May it please the court. My name is Dan Russell and I'm here on behalf of is that Floor's negligence caused an enemy attack on U.S. military forces at an overseas base in the middle of an active war zone. At the time of the attack, Floor was performing mission-critical, non-combat support functions, functions that were historically performed by uniformed soldiers. The district court held that the state law claims at issue here are barred under this court's combatant activities preemption test adopted in the Burn Pit case. On appeal, in an attempt to avoid the preemption issue, Specialist Hensley argues that this suicide bomber case is not about base security and not about military judgments. Specialist Hensley invites the court to narrowly focus on Floor's conduct and he claims that the battlefield context and the military judgments that governed Floor's activities are simply not relevant. Your Honors, the court should reject such a myopic approach to the preemption inquiry. It is not consistent with this court's precedent and beyond that, in an area of profoundly important and broad federal interests, it simply misses the forest for the trees. Russell, I have two factual questions I haven't been able to figure out and strike me as potentially relevant but I was hoping you could help me out. Did the Army, I understand the Army mandated hiring Afghan nationals. Did the Army require Floor to hire the bomber specifically? The Army placed the bomber into the hiring pool and never warned Floor that he was, that he had a Taliban past and so I understand that and you didn't have to and again whether this is controlling or not but I just want to make sure. The Army did not say hire that man. They sponsored him specifically, placed him into the program for hiring so I think he effectively. Is everybody, wait hold on, is everybody who's placed in the pool for hiring, was every single one of those people hired? They have to go through a military vetting process but they yes, they will be hired if the military sponsors them for hiring. And then the second question is say, say before you. Sorry, I want to make sure I understood the answer there because I'm not really clear on this. If Floor had decided for whatever reason this person didn't have the technical skills, they didn't like the way he dressed, whatever it was, are you saying that they had no discretion but to hire him or they had the discretion to choose whether to hire him or somebody else? The contract required Floor, mandated Floor to hire local nationals and this individual was placed in the local national pool. There's nothing in the record specific to that, the question of consideration of NIAB specifically. However, the requirement in the contract pursuant to the Afghan first policy was that Floor had to use a local national workforce. That's still not answering the question. Did they have the discretion to hire this bomber or to have him if they chose to do so? Your Honor, I think that the combination of the contractual requirement and the military sponsorship of him effectively required Floor to have hired him in the first place. But I don't think that is the issue and I did want to address Judge Hyten to one of your questions. I just have one other factual question. That's the front end. My other question I promise is my only factual question at the back end. Would the army have forbidden Floor from firing him? Like say he's just, I mean, rather than being a suicide bomber, say he was just wretched at his job. Would the army's contract with Floor have forbidden Floor from firing him? The answer is that there's nothing in the contract that would have specifically forbidden it. However, the facts as we know it are the military knew he had a Taliban past. No, I'm not talking about the Taliban. I'm just talking about he's a terrorist, that if at some point the Floor, I don't know, the manager on site was just like, this dude is awful at his job. He is just a terrible, legitimately terrible employee. So regardless of whether he has a tie to the Taliban or not, he's fired. Was there anything about Floor's agreement with the army that would have prevented them from doing that? I think that complying with the Afghan first policy would have... No, no, they've got another Afghan. They're going to fire him and replace him with another Afghan national. If the record had different facts in it showing that he was a horrible worker for years and years and years, I mean, I don't know the answer to that question specifically, because I don't think it's been addressed. But it seems, I mean, I guess it seems to be quite important to know the answer to this, right? If the army could, if Floor had to hire him in the first place and if Floor could have fired him, but you're saying the record just doesn't tell us the answer to either of those questions. I think the record reflects that there was a There's a memo in the record from the military to the military saying we need to hire this individual as part of the Afghan first program to help reintegrate him into Afghan society. So there is specific evidence in the record saying hire this guy. And then beyond that, your honor asked a question earlier about whether there was any evidence indicating that Floor knew of Nayeb's Taliban past. The district court opinion states plaintiff does not dispute that the military alone knew of the threat posed by Nayeb, including that he was a Taliban associate. That is an undisputed fact in the record for this court. I wanted to make sure that was clear. If I could continue, the next point I was actually going to make, Judge Agee, you made during the earlier argument, which is in order to assess the application of the preemption defense and the political question doctrine, this court must look at this case as it would actually be is that this case squarely falls within the preemption test. Because if this case proceeded to further discovery and a trial on the merits, and that's if a trial could even be held, given the vast quantity of classified information at issue, if it did, inevitably, the result would be judicial scrutiny of wartime military decision making. There are numerous military judgments that would be the centerpiece, the focal point of any further discovery and any trial in this case. For example, and we've mentioned some of these, the military made a deliberate choice to bring a Taliban fighter onto the base for employment. That was a military decision. It was in furtherance of a military policy. The military chose not to warn floor. For whatever reason, the military decided it was best not to warn floor that this individual Nayeb was a Taliban fighter. Opposing counsel seems to argue that in that circumstance, since the military cannot be found under South Carolina law, that doesn't make a difference. Your Honor, it makes a difference because the result here will be judicial scrutiny and second guessing of wartime military judgments, which is precisely what the preemption test is designed to avoid. So regardless of the nuances of South Carolina law, even assuming for a second that that is applicable, it would only be applicable, if at all, to some portion of the political question analysis under this court's ruling. As to the preemption rule, which as the district court held is a broader rule, the question is whether or not floor's activities were subject to the military's command authority. Can I ask you about that? Do you think under the steel company rule, could we decide the preemption question before deciding the political question doctrine, or do you think we have to decide political question first? Your Honor, it's an interesting question. The Supreme Court has addressed whether the steel company rule applies in this specific scenario. The only thing I could find is an invited amicus brief where the federal government took the position saying they think you could do preemption before political question, but that's all I could find. And that was precisely where I was going to direct the court. There's two places I would. One, Tenet v. Doe is the case, the Solicitor General brief that you're referencing cites, and that's a case involving the Totten Bar, in which the Supreme Court held that it could dismiss a case based on the Totten Bar, which has to do with the courts have no place ruling on secret spy contracts. And so there was a question about subject matter jurisdiction, and then the Totten Bar, which was non-jurisdictional. The Supreme Court dismissed on the non-jurisdictional ground because it held that the purpose of the Totten Bar was to avoid the judicial inquiry at all. So I would say that there are parallels there to the preemption test here, which is designed in part to avoid the judicial inquiry into military decision making. And so I do think that there is some room for this court to interpret. But I assume your client would be happy with any decision that just ends with the word affirmed. You don't care how we get there? That's a safe assumption, Your Honor. And the other authority I was going to point you to is the Fifth Circuit's decision in Fisher v. Halliburton, in which, albeit in a slightly different procedural posture, it was on 1292b appeal, the Fifth Circuit held that preemption barred the claims. In that case, it was the Defense Base Act preemption, and specifically stated it was not going to address the jurisdictional political question doctrine issue that had been raised. So there is some precedent out there for the court to bypass it. But as you said, an affirmance on either ground would certainly be welcome. And we do think that there are grounds in the record for both the political question doctrine and the combatant activities preemption. So how would the district court in the first instance be passing judgment on military decision making here? How would that manifest itself? Your Honor, in a couple of different ways. To begin with, this is a tort case involving a claim of negligence. There has to be some finding of a standard of care or duty of care. And in this case, in trying to do that, inevitably, a number of military decisions would come under scrutiny, including the military decision not to warn Floor that they had a Taliban fighter amidst their workforce. And in attempting to craft a state tort duty of care as to what is a reasonable amount of supervision, you would have to take into consideration, you'd have to evaluate the military's decision not to warn its contractor that it had this Taliban fighter within its workforce. Now, in addition, the issue of causation would be evaluating that or simply acknowledging it as a fact? Your Honor, I think it would be evaluating, it would be scrutinizing, there would be commanders, there would be subordinates that would be called to testify about the military failures that led to an enemy attack. And that process is precisely what the court's preemption rule is designed to prevent. The raking over the coals of military decisions in a wartime setting that inevitably will impact how the military operates in future engagements. That's a space that this court held, the federal government occupies the field. Introducing state tort law here would result in, you know, the word that's used in the burn pit decision is state law touching military judgments. It's going to be more than touching military judgments. If this case goes forward, the discovery will be aimed at the military and commanders will be forced to testify as to how this individual got explosive onto a military base, a secure base, and how the military force protection systems failed. It leads me to another point I wanted to make in response to Judge Rushing's question earlier. Judge Rushing, you had asked about the contractual obligation that Floor had. I want to be clear, that contractual obligation was a limited workplace supervision role at all times, including while the NIAB was at his work site. The military alone was responsible for supervising him for purposes of base security. For example, the military conducted canine sweeps of the workstation. The only reason they did that is because they're responsible for ensuring he doesn't have a bomb. So they're doing that. They're conducting those types of canine sweeps. They're physically searching him every single day he comes onto the base. They're vetting him. They're conducting intelligence screening interviews with him, all because that is their role and their role alone. Floor doesn't have the discretion to conduct that kind of security. Under the contract, Floor was prohibited from doing that. We have a little bit of an odd fit for this case. We have precedent where a contractor is hired by the military to do a job. In doing the job, they injure someone. So they're hired to provide electricity. They provide electricity negligently and injure someone. They're hired to fix the ramp for the tanks. The way they provide electricity to that injures someone. Here, it's not the work. I mean, it's not the services that Floor was hired to provide that injured someone. I know they're trying to say it's supervision, but this could happen no matter what job, what service you're providing. It's the fact that this person was an enemy combatant that was unknown. So I'm not sure that the tests we've been given, it's all we have to work with. But I don't know if you have any thoughts on how that affects our analysis, or does that just mean we should be looking at just that security supervision, even though plaintiff is trying to allege something a little different than that? A couple of points, Your Honor. First, the plaintiff has alleged base security as a duty in the complaint. There's about a dozen places in the complaint that you look at where paragraph 240, for example, they refer to Floor's obligation to provide base security. Paragraph 244D, they refer to Floor's contractual obligation and duty to preserve base security. So that is in the complaint. Now, I think more importantly to your question, the component of the case does distinguish this. This is not an instance in which a worker at a maintenance shop did a bad job changing the brakes or changing the oil, and then an accident happened. The allegation is that Floor should have taken other action to stop an enemy attack. And I do think that takes this into another category. I do think there are parallels between this case and, say, Burn Pit, in which the military made a number of foundational decisions that ultimately governed how the contractor acted. So in Burn Pit, for example, the military decided the method of waste disposal to use Burn Pits, the military decided where to monitor air emissions to ensure that it didn't believe there was an inordinate risk from them. Here, the military decided as a policy matter to hire local nationals and decided to hire this specific individual. They sponsored him for employment. You don't have the level of control like you had in Burn Pit, and maybe you don't have to because Burn Pit was on political question. It wasn't on preemption in the end. Well, Your Honor, I do think we have the level of control, and part of it is because this is a security issue and not a case in which there's an allegation of poor maintenance. With respect to security issues, the military absolutely controlled what Floor could and could not do. Floor was not allowed to bring on additional supervision at the workplace. It wanted to do that. It offered to do that. What's the evidence that they weren't allowed to bring on any supervision? The only evidence I'm aware of is you asked for more money to do 24-hour surveillance, and the military said no. What evidence is there that you were not allowed to do any? I mean, I guess given what we know about the facts of this case as alleged, it would be shocking to me that you were not allowed to do any more supervision because I think at least potentially the record is read as there was no supervision whatsoever. Your Honor, there is a difference between supervision for the purpose of performing the work and supervision for the purpose of security. The former was what was required under the contract, and we acknowledge that. The latter was not only not required, but it was prohibited. Floor was prohibited from performing any security function. That's one point. They couldn't perform a security function. Wait, wait. You couldn't decide whether he could access the base. I agree there's evidence that you had no ability to do that. And when you asked to follow him around for 24 hours and be paid more money, when you asked to follow him around the whole time, the army told you we're not going to pay for you to do that. But what is the evidence that you were forbidden from providing any more supervision than you did? Your Honor, let me make sure my point is clear. The evidence in the record is that Floor came to the military and proposed enhanced escorting. The existing base policy that the military established did not allow escorting at the worksite. It required escorting at other places, but specifically excluded the worksite from the policy. So there was a gap in the policy, and Floor proposed filling that gap, and the military said no. And why is that relevant here? If a state tort duty were to be crafted as to what's the reasonable level of supervision, that's going to run headlong into that military decision that should govern. The military should be able to decide whether or not to put forward more resources into that workplace supervision function. And allowing state tort law to control it is going to unsettle what is right now an exclusively federal responsibility. Well, did you need more resources to allegations to determine that this fellow didn't need any tools, but he was checking out tools all the time that he didn't need for his job. He was sleeping on the job. He was just gone sometimes. Was there any restriction in the contract that prohibited Floor from observing those things and taking action against an employee who did them? Your Honor, I don't believe there's a restriction. I just don't think that's the inquiry under this court's preemption rule or under the political question doctrine. And again, I think what brings this case over the line and beyond even Burn Pit or Taylor Carmichael is that this is a case in which an enemy attacked U.S. forces. And inserting state tort law into that equation is going to do harm to the federal interests that are identified in the Burn Pit decision, which include avoiding judicial scrutiny of military judgments. Can I just get a clarification on that? Because I feel like at times your argument blends two things. I think we can all agree that the precedent says we can't question. You need to avoid questioning military judgments. But I think at times your arguments seem to come up to me to say, there is no, we need to avoid judicial proceedings that make the military look bad in some people's eyes, right? There is no freestanding principle that we can't let any lawsuit go forward that might embarrass the military or make the military look bad as an abstract matter, right? Your Honor, I don't know that embarrassment is the issue under the case law. I think it's judicial scrutiny of military. Right. But I guess what I'm saying is you agree that there is a distinction between judicial scrutiny, which is forbidden and a legal proceeding that's going to result in some evidence that makes the military look bad. Under the facts here, I'm not sure that there's a, there's a path, there is no pathway under which I'm just asking you if in principle you agree those are different things. I think that there are judicial proceedings that sometimes take place that involve military actions and not all which make the military look bad. Yes, Your Honor. And I think this court has said that not all military actions are, you know, outside of the review of the judiciary, but this one is. And you know, I wanted to make one or two other points before I sat down. And one of them is to get back to this issue of whether the military mandated the use of NIAB and the local national workforce. The day after this attack, the military effectively fired 1,500 local nationals and got them off the base. That illustrates the level of control that the military had over the workforce. If the military had made that decision two days earlier, we wouldn't be here. The military controlled the fact that those 1,500 local nationals were on the base and they decided to effectively fire them. The contract might say that there's a technical abstract obligation on floor to hire and fire, but in reality on the ground and in this record, it's clear that the military controlled that. Thank you, Your Honors. Thank you very much. Mr. Schneider, you've got some time in rebuttal. Yes, Your Honor. Just a few quick points on the factual question. Our opposing counsel says that in the trial of this case, that it's necessarily going to involve military personnel as witnesses, a lot of military documents, some of which may be classified, some of which aren't, and that that will inevitably involve judgments by a judicial authority on the judgments of the military. What do you say to that? This court's holding in Burn Pit and the Third Circuit's holding in Harris make it clear that the fact that there may be testimony from military officials is not enough to get to a judicial evaluation of the military's conduct. Essentially here, floor is going to present a factual defense. They're going to say the army allowed the explosives to be smuggled onto the base, the army cleared this man for hiring, and then the jury's going to have to decide not whether this bombing was the army's fault. Get into a military security issue, a pallet one about vetting foreign nationals in a war zone, all sorts of things of that nature that seem to be very sensitive for judicial review. They may be a sensitive issue, but under this court's precedent and the Third Circuit's precedent, that simply having military people testify in a case about policies, about facts, is not enough to get to judicial evaluation. The only question the jury's going to have to decide in this case is did floor cause this bombing, and what are the damages if they agree that it did? Mr. Snyder, could I ask you to address your friend on the other side's point about how the military brought canine units around to sniff for bombs at the work site, and that that suggests that it was even within the base, the military was in charge of security, not the contractor? It is undisputed that the military had effective command over security in the base. The reference to canine sweeps is one paragraph in an affidavit from a floor employee saying that at times the military did that. There's no evidence that the military ever did that during the time period when Mr. Nye was building the bomb. There may be some overlapping authority there as to security, and if this was a negligent security case, that could be a problem for us, but to Judge Rushing's point, floor was obligated, they were hired to provide labor and to supervise that labor on the base, and that failure to supervise their labor was a cause of this bombing. The claim is not preempted because we know that Mr. Nye committed an intentional attack. The focus here is what is the conduct that is at issue and whether the army actually commanded that conduct, and there's simply no evidence. Mr. Russell acknowledged there's a gap in the policy as far as escort goes, and that gap was filled by floor's discretion to supervise its own employees, and I would just note one thing, Your Honor. The military did in fact find that floor had failed to terminate this man and that it was obligated to do so in the army report, which is in the record at JA 121. They found that the lack of formal counseling or disciplinary action showed a failure to enforce a work-related standard of performance, and it was the unjustified retention of Mr. Nye. Thank you, Your Honor. Thank you very much. We appreciate the argument from both counsel. As you all probably are aware, we normally come down and greet counsel after argument, but that's not in our operating procedures at this point, so we hope you'll come back on another occasion and we'll be able to do that.
judges: G. Steven Agee, Allison J. Rushing, Toby J. Heytens